Good morning, your honors. Good morning. May it please the court. Vanessa Ruggles on behalf of appellant Michelle Cameron. I'll reserve four minutes for rebuttal. All right. And you see your clock there? It usually happens as it races by, but I'll try to help you as well. Okay. Thank you. I appreciate it. Because the court asked the parties specifically to address the excessive force issue, I'll jump straight to that. The use of excessive force in this case was part of the conspiracy between deputies Buther and Craig to use the criminal process to gain an advantage in Mr. Buther's domestic dispute with Ms. Cameron. In fact, Deputy Craig deliberately chose to execute the warrant on a morning when she knew Cameron had custody of the couple's children to enable Buther to call the family's family court mediator and report that the children had witnessed their mother being arrested that morning. Ms. Cameron was a housewife, a yoga teacher by trade with two young children who was awoken at 7 a.m. to 6 to 10 sheriff's deputies dressed all in black with flak jackets, helmets, and automatic weapons drawn pointed at her head. As she raised her arms and told them her two babies were in the room next door, they pushed her, shoved her, jostled her, and finally handcuffed her. These actions were unreasonable under the circumstances for many reasons. Ms. Ruggles, I have to agree with you. I think it's pretty outrageous what happened, but for purposes of what we're dealing with here, the real issue is whether there are material issues of fact that require us to send this back to the district court for a trial on that point. Isn't that correct? Correct. I'm sure that the government will have a different response on this, but are you aware of any cases that justify this level of force? Again, we're taking the facts as pled by your client. I don't know what actually happened, but as pled by your client, are you aware of any cases that involve this type of conduct that made it through summary judgment? For example, Robinson from 2002. The suspect was not armed. He wasn't dangerous. He wasn't aggressive. He wasn't agitated. And the deputies, or I think it was sheriff's deputies in that case as well, pointed a gun at his head from six feet away, which is actually farther away than in this case, and that made it through. Okay. And here we have they're executing a warrant on a nonviolent property crime. Ms. Cameron doesn't have a criminal history, no history of violence, gun use, gun registration. There was no evidence that any occupants in the house had any criminal history or violent tendencies. These children, correct me if I'm wrong, these children were the children of Officer Buehler, right? Buehler and Cameron, yes. That's what I thought. So these were his own children. Right. And how old were they again? Eight months and two years old. So they got, it's sort of unclear. I think there's six to ten armed assistants. Is that sort of, do we have anything further than that, or is that pretty much just a range that is testified to? That's what Ms. Craig, the investigator, that's what she testified to. Ms. Cameron estimated 13. In our brief we used six to ten because whether it's six or 13 the effect is pretty much the same. In many of these cases you have hearsay. People say things to the officers or they pick up radio traffic or something, the truth of which we're not here to discern. But is there anything from the record, and I couldn't find any so I'm asking you, is there anything from the record that indicates things were told to these officers by any random persons about what was going on when they went there? No. Was it agreed upon by everyone that the operative facts are exactly what we have here? Yes, sir. No more? Even hearsay? Even hearsay. Okay. The only argument that the county may offer is that there was one occupant of the house that was, quote, unknown. But that just goes back to the incompetency of the investigation performed by Ms. Craig. Had she interviewed some people? Had she talked to perhaps Ms. Cameron's friends or roommates or family? And the record's not real clear what was unknown about that person. Did she not know his name or his or her name? We don't know whether it was his or her. No. Okay. Is there anything in the record about any relationship between Craig and Beuther? I understood they went to academy or whatever it was called together. Is that correct? That's correct. Is there any allegation of a romantic relationship between them at all? There's no direct evidence. Okay. It seems implied in a way. They socialized together outside of work. Craig had Beuther's cell phone number. They answered literally hundreds of calls together. And this is the San Marcos Sheriff's Station is a small substation. This isn't the San Diego County Police Department or City of San Diego Police Department with hundreds of people. It's a very small substation. It's easy to imagine that they knew each other well, were social, were friendly, at the least, at the very least. But in any event, they were at least close colleagues on a professional basis. Exactly. That's in the record. At least. All right. So the excessive force issue, I think that we have covered it, unless you have any other questions about it. There was just no justification for the use for a nonviolent property crime such as this. It was the grand finale to this plan, to embarrass and intimidate. The real question here is whether there are disputed issues of material fact. And based on the case law, there certainly appear to be. And that's really what we're dealing with here. We don't know whether any of this is true at all, but that's what the pleadings say. And we have to construe the pleadings in the light most favorable to the nonmoving party here. And that's what we're happy to wrestle with. Exactly. So our position is, obviously, that there was a constitutional violation. The parties agree on the facts. And we submit that there was a constitutional violation. Does the county agree with your version of the facts? Yeah. I do. Interesting. Yes, Your Honor. But this is the county's summary judgment motion? Correct. There's not a cross motion for summary judgment? No. Okay. Why don't we hear from the county? Thank you. Thank you. Good morning. May it please the Court, my name is David Axman. I'm with the Office of County Counsel on behalf of Sheriff's Detective Michelle Craig and the County of San Diego. One point I'd like to make initially is that Detective Craig is not liable for the other deputies' pointing weapons. And that's admitted in the appellant's reply brief on page 14. She was a commanding officer? There's no evidence that she was the commanding officer. Did she organize the raid? She planned it, yes. Okay. She selected the people who would go? I don't know. It's not in the record. Okay. So from her point of view, that should resolve the case as to her on the excessive force claim. I'm sure she does feel that way. I think that's correct as a matter of law because there is no vicarious liability for what other officers do. And I was able to cite to a couple of cases on page 31 of our opposition brief to that effect. Are you contending then that she had no ability once the execution of this warrant started to take place, she had no authority to stop it? It's not in the record. Has there been any discovery with respect to the other officers and who gave what instruction to whom, what to wear, what time to go, what to say, what to do? No. And the identity of the other officers hasn't been discerned either. Okay. So if it goes back, then all that can be determined. Right. I don't know if it will be or not. Discovery was closed. I guess one never knows. Sometimes when they get remanded, well, obviously it's in the hands of the trial judge. It just seems to me here, of course, we have to construe everything in favor of the plaintiff and even the inferences in terms of her organizing the raid and putting the wheels in motion and being there. So I'm hard-pressed to know why there wouldn't at least be a factual issue on this excessive force claim. Well, there hasn't been one established in the record. I mean, aside from you mentioned inferences, but it's really speculation as to … Well, but you have to give all inferences in favor at this stage. Yes. You don't need direct evidence. But on summary judgment under Celotex, the county and Craig came forward with evidence. It needed to be rebutted with evidence. What evidence did you come forward with showing that you didn't show up at that time of the morning with a certain number of armed people dressed in black to somebody who at most was going to be charged with a misdemeanor, where it was probably well known that this was a domestic dispute? I mean, doesn't that screen excessive force? No, Your Honor. I don't believe it does. And I should point out, and I should have already pointed out, that the facts are not agreed upon. Okay. That's important because opposing counsel said they were. What part of this does the county not agree with? Let me explain how this case appears to us. It appears to be an unfortunately timed in terms of the presence of the children. Oh, wait a minute. Wait a minute. What I'm interested in, and I suspect my colleagues are as well, your opposing counsel has said that the allegations of the complaint, if I understood it correctly, that the county agrees with respect to the excessive force allegations, not as a matter of law. So what I'm saying is if you take these allegations, what specifically, what factual distinctions does the county dispute? I mean, if you just go down here. We've got six to ten deputies enter the apartment with guns drawn. Do you dispute that? No. Their guns were not holstered. They were not holstered. So they were drawn. Yes. Okay. And they were dressed in black. That is what Michelle Craig testified. And does the county dispute that? No. And they had bulletproof vests and helmets on. Michelle Craig testified that she thought they may have had helmets on. All deputies always wear bulletproof vests. Okay. So basically you're not disputing that. That they were armed and possibly with automatic weapons or shotguns. They do not have automatic weapons. Okay. Do they have shotguns? They didn't use them. They didn't use them, but did they have them? I don't know if they had them or not. It's not in the record. Okay. She alleges that. So you are disputing that then? Yes. I didn't understand them to allege that. Okay. It's ER-102 and SER-217 and 218. They encountered her in the upstairs hallway. Yes. Multiple deputies aimed their weapons at Cameron. No, there's nothing in the record about that other than Cameron. Okay. And that's SER-183. She was trying to alert the officers to the presence of her children in a nearby bedroom. Do you dispute that? I don't know whether she was or wasn't. Okay. So you're just agnostic about that. Some of the officers approached her, grabbed her by the arm and the shoulders. I don't know if that occurred or not. But you're not denying it? Well, I don't know, so I'm not acknowledging it. Okay. You're not denying or admitting it? Well, I can't deny something I don't know about. It's not been developed in the record, Your Honor. No, what I'm trying to understand here is that she's alleged, your opposing counsel has alleged that the county agrees with the basic facts here. You're saying you don't. I'm trying to flesh out what you don't agree with because it makes a big difference. I mean, if you say, you know, there is no material issue of facts here, then it must mean you are in agreement as to the basic material facts, and as a matter of law, they lose. Isn't that a correct statement? Yes. I set forth the factual portions of the record, which bear upon the excessive force claim on pages 3 and 31 of our brief. And what occurred, Your Honors, is the deputies arrive at a multi-story residence with multiple occupants, some of whom are unknowns, and so you can't determine what might occur when you go in. And I think it's best to look at this case as a defensive use of force and positioning upon entry until you secure the residence and identify the occupants. To do otherwise, I think, had there been dangerous people inside, there would have been a lot more people killed. Is there any evidence? Or a lot of people killed. Is there any evidence that there were dangerous people inside? No. Is there any evidence of any felony conduct? No. Is there a policy of the county in executing warrants to bring along many individuals armed with the appropriate equipment for a fight when they're executing warrants? Is there a policy here? I don't think there's a specific policy that says that. But this circumstance involved there were at least four or five people suspected in the residence on multiple levels, multiple stories. Suspected means what? That there's thought to be many people in this? Well, they lived there. They were roommates. Was there anything known about those persons who were living there that would have been of concern to the officers other than just normal taxpayers? No. The fact is they didn't know. So to go in without your guns available, and if there was a dangerous person that you didn't know about, that would invite a conflict. I'm not saying they went unarmed. I'm saying is there anything about that situation that was related to them, hearsay or otherwise, that they were relying on to indicate that this was an unusual circumstance that would be reason for them to be prepared for a firefight or something else? Nothing on the record. Okay. I want to be sure I understood your answer to Judge Bell's question. Is it the policy of the county to take Ms. Cameron out of this? You've got somebody that's alleged to have failed to or they misused a credit card and they live in Del Mar. Is it the policy of the county to send out six to ten armed deputies dressed in black with bulletproof vests and helmets at six in the morning to arrest them? Well, deputies always wear helmets. Okay. I get that. Even when they go to the bathroom? I don't know the exact configuration. In the shower? Helmets. On duty. Oh, on duty. Okay. So they don't shower on duty. Okay. Is it the policy of the county to do that? Well, it's the policy of the county to use reasonable force under this circumstance. We understand, and the Supreme Court has made it abundantly clear, that we need to defer two officers for their protection. But there is a certain amount of reason that's required as well. It has to be proportionate. And what's troubling me anyway is that there appears to be, even if you accept the search warrant, it's okay and all that sort of thing, the reality is there's nothing that I see in the record that justifies this level of force. That's why I'm asking whether the county has it. If you deal with everybody, then maybe we need to look at it in a different way. But can you tell me, is there anything in the record, or can you tell me as an officer of the county if that is the policy of the county? There is nothing in the record. Okay. And you can't tell me whether that's the normal policy. I don't know all of the Sheriff's Department's policies. Do you know some of them? I do know some. Have you ever seen a situation like this before? I haven't had a case like this before. Okay. Was the focus, and we're all kind of going this way, crossing each other here. You look perplexed, and I think we are kind of too. Was the focus at the initial part of this case on whether or not there was probable cause for a search warrant or for the arrest, was that the issue? And was the force question a secondary issue below? As a practical matter in terms of the discovery that was conducted, the warrant issue was from at least our perspective. And what we saw how discovery was being conducted was the only issue. In fact, I was the one that raised the use of force issue on summary judgment because I wanted it cleaned up. It was unclear whether it was even alleged. And so I brought it up in oral argument with Judge Gonzalez because I was concerned that we wouldn't have a complete record if I was wrong on the pleadings, and a reviewing court determined that the pleadings were sufficient to raise the issue of excessive force. But in terms of discovery, that's why so many of my answers are I don't know. It wasn't developed. I mean, it just seems an odd thing. You read Craig's deposition. They know the children are going to be there. In fact, they even make these arrangements for Mr. I guess his name is Buther also. David Buther. Mr. Buther to be on standby to come get the kids. So it's like there was something about this that doesn't sit right. Obviously, you didn't make these facts. But when you add all this up and then you say, well, is there any inferences to be drawn about force? She alleged that they were pointing these guns at her. That's in the record. So that's I guess do you dispute that there were six to ten guns pointed at her? There were six to ten deputies. I don't know how many actually had their guns or how many pointed them at her. But I think in this case it's important to also remember that the guns were only displayed for a relatively short period of time. And once the occupants were identified and the premises secured, there were no more guns. And no guns as in Baldwin or Trekle were pressed against anyone's head or held to their head even after people were handcuffed. This kind of goes back to the warrant to some degree because basically you have this thing hooked up between the two officers. You've got a domestic dispute over some property. And they go in there at 7 in the morning when they know there's kids going to be there. And then now they come back and say, oh, but we were worried about unidentified people and the risk that we were posing to ourselves. I mean, they created the circumstance. When you're going to arrest somebody for credit card misuse or possession of property that they've obtained illegally, you have a lot of leeway, don't you, as to when you go in and do that? I don't know police practices sufficiently to answer that. I know that Detective Craig testified that in her deposition, and it's in the record, that no other time would work for them. And then they ask her why she couldn't. Why is that? Well, I don't know. No other time would work. I mean, that is preposterous, okay? So, I mean, I know what she said. Right there she's created an issue of fact of inference. I mean, we have to bring some common sense to some of this. Your point, I think, your legal point, as I heard it was, in your view, there's nothing to link Ms. Craig to the defendant. Is that what you're saying? Yes, and can I add, because I know I'm out of time. You're out of time now. But under the Baldwin case and the Tech Lake case, which are Ninth Circuit cases where motions for summary judgment were reversed, the facts were much more egregious, and they were actually involving batteries. So if that's what a reasonable officer is on notice of, Detective Craig would be entitled to qualified immunity because there's no factual context addressed by any decisions that would have guided her otherwise. All right. Thank you. Thank you. Ms. Ruggles, it seems to me one of the areas you need to address, brought up by the county's counsel really, is how do you tie Ms. Craig to this excessive force claim? Well, let me rephrase what may be taken as a concession regarding her liability in the reply brief. She's not vicariously liable for the deputies pointing their guns at Ms. Cameron. However, she is directly liable as an integral participant in the unlawful act. Obviously, she set into motion this series of acts, and she knew that the series of acts would result in a constitutional deprivation of Ms. Cameron. So Ms. Craig is directly liable for her role in the situation. Is it your position that this was a matter, timing-wise, of very short duration? Five, ten minutes? Between what and what? Between the time that the entry was made to the house and the time guns were back in their holsters and people were in their respective corners. Well, we have evidence on the record that they entered the house at 7 o'clock, which, by the way, is the first moment that you can enter a house without a nighttime, without special permission to enter at night. And Craig and Cameron were on the couch talking at 7.30. So there's a half an hour there of this guns, kids, jostling. So I'm not sure of the timeline. Unfortunately, as counsel mentioned, the record isn't developed that well in that regard. But you're not arguing kind of a false imprisonment or a dragging the matter out situation. You're just arguing the emergent events that occurred and whatever else occurred instantaneously, if you will, at 7 o'clock in the morning. Correct. And the several minutes, I'm sure that it took the entire process to happen. I can also address a couple other points that were brought up with opposing counsel. When I said that the facts are not in dispute, if you look at the county's original motion for summary judgment, which the county nicely included in their excerpt of records on S.E.R. 95, it lists the facts. And one of the facts is the deputies pointed guns, which is a kind of vague way of, you know, our position is. And Ms. Cameron testified that several officers were in the small hallway with her with their guns pointed at her head. Is there any allegation in the record that any of the guns actually touched her? No. She did testify, I gather, or there's an allegation that they grabbed her arm or grabbed some other part of her body. Is that correct? Correct. Did they push her, shove her? Yes. Push and shove, I believe, were her words in the deposition. Any allegation with respect to the children? Did anybody move the children, touch the children, point guns at the children? The 2-year-old was running around in the house while these officers are there with their guns drawn. The girl or little boy? Two little boys. How long were the guns drawn from your client's perspective, time-wise? I'm not sure that it's clear in her deposition, but as she described it, it took several pages of the transcript. She walks out into the hallway. She hears these loud noises. She walks out into the hallway. As she's halfway out into the hallway, she sees these 6 to 10 deputies also in this narrow passageway pointing their guns at her. She puts her arms in the air and says, My children are right there. My two babies are in this room. What's going on? They pushed her back, grabbed her arms, jostled her is a word that has been used. Handcuffed her. And then they handcuffed her. So did that take 5 minutes? I'm not sure. Or 1 minute. If 1 minute, if everybody's doing things the way they should. Right, right. I don't know. I'm looking at what you referenced and counsel referenced, which are this stipulated, or I won't say they're stipulated, but claimed to be not disputed facts, and that was that no one was pointing a gun at the plaintiff. And they cite that at SER 96. No one was pointing. Well, Cameron testified in her deposition that there were several guns pointed at her. And if the county wants to say facts are disputed. Now I do see that. You know, they say the deputies pointed guns, and then on the next page they say no one was pointing a gun at plaintiff. Well, then I don't know who they were pointing their guns at. That's a material issue of fact then. Correct. All right. Just a couple other points that were brought up. It's true that we want to defer to officers for their protection, but here there were no split-second decisions being made. This was all planned out way in advance. So this isn't, well, we need to defer to the officers to make sure that they have some latitude to do what they need to do to protect themselves. And you would in part rely on the fact that 7 o'clock a.m. is the earliest time that they could execute this type of an arrest warrant without getting special permission. Is that right? Yeah, it's just interesting that precisely at that moment. Well, the inference has to be drawn in your client's favor in a summary judgment situation. Correct. As a non-moving party. Correct. Also, discovery can be reopened if the case is remanded. So it's not a problem to develop the record further. It can be reopened because Judge, it's not Martinez. Gonzales. Okay, Irma Gonzales, right? So you leave it to her if we were to send it back or we should direct that discovery be opened. She would do that. It would probably be wisest to direct it. But you didn't ask that. We did not. Okay. We didn't. All right. Never mind then. I would also just like to point out that there was some discussion of, well, we don't know what general police practices are. But Ms. Cameron's police practices expert, Smith, did testify that this was completely over the top, that this is not standard practice, that this is not the way the execution of a search warrant goes down for a simple property crime. So unless anybody. One other question. Is there anything in the evidence that shows that Buther used the arrest in his domestic proceeding as evidence of one thing or another? Is that in there? He called the family court mediator that same day to report that the children had seen their mother arrested. Beyond that, I don't know if it actually did give him an advantage. I don't mean that. I mean, did he use that as evidence in his favor? Yes. I think that can be inferred by him calling the mediator and somewhat happily reporting this. All right. It appears there's no further questions. Thank you. Okay. Thank you very much. We thank you both, counsel, for coming, for your argument. The case of Cameron v. Craig is submitted.
judges: Bell, McKeown, Smith